**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Sean L. Litteral (State Bar No. 331985)
Julia K. Venditti (State Bar No. 332688)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email:  ltfisher@bursor.com
         slitteral@bursor.com
         jvenditti@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FAITH NORMAN, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | <u>JURY TRIAL DEMANDED</u> |
| GERBER PRODUCTS COMPANY, | |
| Defendant. | |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff Faith Norman ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendant Gerber Products Company ("Gerber" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which is based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a putative class action lawsuit against Defendant for cheating consumers by uniformly advertising, marketing, and selling nutritional food products under the brand name "Gerber" (collectively, the "Products," enumerated below), each of which prominently features the representations "Non-GMO," or similar claims related to the absence of ingredients derived from genetically modified organisms ("GMO") (collectively, the "Non-GMO Claims").   However, contrary to Defendant's claims, each of the purportedly "Non-GMO" Products do, in fact, contain ingredients that are derived from genetically modified food sources and therefore constitute GMOs.

2.      Defendant prominently labels every Product sold in the United States as "Non-GMO."  Defendant does this because consumers perceive all natural foods as better, healthier, and more wholesome.  Indeed, in recent years, consumers have become significantly more aware and sensitive to genetically modified organisms ("GMOs") in their food.  Many consumers want to avoid GMOs for a variety of reasons, including, but not limited to, the following: (1) health risks associated with ingesting foods derived from genetically modified ("GM") crops;[1] (2) concerns of the ingestion of pesticides and other toxins; (3) interest in promoting sustainable living and local farming; and (4) negative environmental effects associated with growing GM crops.  As a result, many consumers, including Plaintiff, try to buy products that are not derived from GMOs, and a movement has developed demanding consumer products that are non-GMO products.  Thus, the market for all natural foods has grown rapidly in recent years, and Defendant seeks to take advantage of this trend through false advertising.

---

[1] GM crops such as canola, corn, and soy, are crops whose genetic material has been altered by humans using genetic engineering techniques.  The World Health Organization defines GMOs, which include GM crops, as "organisms in which the genetic material (DNA) has been altered in a way that does not occur naturally."  Accordingly, GM crops are not natural, but man-made.

3.      But Defendant's Non-GMO Claims concerning the Products are false, misleading, and deceptive to consumers, who reasonably understand such claims to mean that a product was produced without genetic engineering and its ingredients are not derived from GMOs. Specifically, Plaintiff and consumers reasonably understand Defendant's Non-GMO Claims to mean that Defendant's Products are 100% free of ingredients derived from GM crops or food sources, genetically engineered in a laboratory setting through the use of biotechnologies, or sourced from animals that have been raised on GMO feed. Yet, contrary to Defendant's claims, Defendant's Products are in fact loaded with ingredients derived from GM-crops such as corn and soy, and many of Defendant's Products also contain protein and/or dairy sources derived from cows raised on GMO feed. Defendant's Products also contain numerous artificial ingredients that were genetically engineered in a laboratory setting using biotechnologies. Accordingly, Defendant's Non-GMO Claims are misleading and highly deceptive to reasonable consumers.

4.      The Products at issue include all Gerber-branded food or drink products that purport to be "NON GMO" on the labeling and/or packaging, including, without limitation, Gerber Products from the following product lines, products, and/or flavors: Gerber Good Start Soy 2 Powder Infant & Toddler Formula; Gerber Good Start Soy Infant Formula (including powder, ready to feed, and concentrated liquid formats); Gerber Good Start Gentle Infant Formula; Gerber Good Start GentlePro Infant Formula (including powder, ready to feed, and concentrated liquid formats); Gerber Good Start GentlePro 2 Powder Infant Formula; Gerber Good Start SoothePro Powder Infant Formula; Gerber Good Start Gentle Supreme A2 Powder Infant Formula; Gerber Good Start Gentle Supreme A2 Toddler Drink; Gerber Good Start Extensive HA Powder Infant Formula; Gerber Good Start Grow Powder Toddler Drink; Gerber Supported Sitter 1st Foods, DHA & Probiotic Baby Cereal; Gerber Sitter 2nd Foods, Probiotic Baby Cereals (including Oatmeal Banana, Oatmeal Peach Apple, Rice Banana Apple, and Powerblend varieties); Gerber Oatmeal & Barley Toddler Cereals (including Apple Cinnamon and Bananas & Cream varieties); Gerber Toddler Pouches (various flavors); Gerber Lil' Crunchies    (various    flavors);    Gerber Teether Wheels, Apple Harvest Crawler Snack; and Gerber Mealtime Harvest Bowls (including

Garden Tomato, Spanish Style Sofrito, and Pesto varieties) (collectively, the "Products").   As noted above, each of these purportedly "Non-GMO" Products contain GMOs.

5.      By prominently featuring the Non-GMO Claims on the labeling and/or packaging of its Products, Defendant intends to induce consumers to pay more than they would pay for other comparable products that are not falsely labeled with Non-GMO Claims, and consumers are so induced as a result of these claims.  Thus, although (as discussed below) the Products have been a marketing sensation and an unmitigated financial success, Defendant's success has been the result of fraudulent, unlawful, and unfair business practices in the marketing and sale of the Products. Defendant's misleading representations and unfair business practices described herein are plainly improper and unacceptable—particularly for a company that touts that "You asked, we listened. GERBER GOOD START formulas are now all non-GMO."[2]

6.       For the foregoing reasons, Plaintiff brings this action individually and on behalf of similarly situated individuals against Defendant for: (i) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq.; (ii) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, et seq.; (iii) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, et seq.; (iv) breach of express warranty; (v) breach of the implied warranty of merchantability; (vi) unjust enrichment / restitution; (vii) negligent misrepresentation; (viii) fraud; and (ix) fraudulent misrepresentation.

## PARTIES

7.      Plaintiff Faith Norman is a natural person and a citizen of California who resides in San Jose, California.  At multiple points during 2021, Ms. Norman purchased Defendant's Gerber Good Start 2 from a brick-and-mortar Safeway retail store and a brick-and-mortar Walmart retail store located in San Jose.  Prior to her purchase, Ms. Norman reviewed the labeling, packaging, and marketing materials of her Products and saw the false and misleading claims that, among other

---

[2] Layla Katiraee and Kavin Senepathy, "Gerber Formula Goes Non-GMO, But Not Really," *Forbes* (Feb. 22, 2016), https://www.forbes.com/sites/kavinsenapathy/2016/02/22/gerber-formula-goes-non-gmo-but-not-really/?sh=60d556437e79 (last accessed Dec. 20, 2021).

things, the Products are purportedly "Non-GMO" infant formulas. Ms. Norman understood these claims to be representations and warranties by Defendant that the Products are free of all traces of GMOs, do not contain ingredients derived from GM crops, and do not contain any other synthetic ingredients created in a laboratory through the use of biotechnologies. Ms. Norman reasonably relied on these representations and warranties in deciding to purchase the Products, and these representations were part of the basis of the bargain in that she would not have purchased the Products, or would not have purchased them on the same terms, if the true facts had been known. As a direct result of Defendant's material misrepresentations and omissions, Ms. Norman suffered, and continues to suffer, economic injuries.

8.  Defendant Gerber Products Company ("Defendant" or "Gerber") is a Michigan corporation with its principal place of business in Arlington, Virginia. Defendant sells its baby food and infant formulas under the eponymous "Gerber" brand name. Gerber's baby food products and infant formulas are sold nationwide, including throughout the State of California.

## JURISDICTION AND VENUE

9.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

10.  This Court has personal jurisdiction over Defendant because Defendant purposefully availed itself of this forum by conducting substantial business within California such that Defendant has significant, continuous, and pervasive contacts with the State of California.

11.  Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does substantial business in this District and a substantial part of the events giving rise to Plaintiff's claims took place within this District, as Plaintiff purchased the Products in this District and is a citizen and resident of this District.

///

///

**FACTUAL ALLEGATIONS**

**A.    Background on Genetically Modified Organisms ("GMOs")**

12.    The World Health Organization defines genetically modified organisms ("GMOs") as "organisms in which the genetic material (DNA) has been altered in a way that does not occur naturally."[3]

13.    Genetic modification ("GM"), also called genetic engineering, biotechnology, or bioengineering, is the process scientists use to make GMOs.  It is an artificial laboratory-based technique that is specifically designed to enable the transfer of genes between unrelated or distantly related organisms.  It includes any process in which genetic material is artificially manipulated in a laboratory, and may involve creating combinations of plant, animal, bacteria, and virus genes that do not occur in nature or through traditional crossbreeding methods.  Genetic engineering also includes newer forms of biotechnology such as CRISPR, TALEN, RNAi, ODM, and gene drives. These techniques confer new properties or "traits" that are not naturally present in the organism. When incorporated into the DNA of an organism, genetically modified genes modify the functional characteristics – the traits – of an organism.

14.    GM crops, such as canola, corn, and soy, are crops whose genetic material has been altered by humans using genetic engineering techniques.  GM crops are not natural, but man-made. There are wide-ranging controversies related to GM crops, including health risks from ingesting GM foods and negative environmental effects associated with growing GM crops.

15.    As of 2021, approximately 93% of canola, 92% of corn, and 94% of soybeans grown in the United States are genetically modified, as are 95% of sugar beets.[4]

---

[3] World Health Organization (WHO), *20 questions on genetically modified foods* (2002), *available at* http://www.who.int/foodsafety/publications/biotech/20questions/en/index.html.

[4] *See* Center for Food Safety, "About Genetically Engineered Foods," https://www.centerforfoodsafety.org/issues/311/ge-foods/about-ge-foods#:~:text=Center%20for%20Food%20Safety%20seeks,human%20health%20and%20the%20environment (last visited July 19, 2021); *see also* https://www.nestleusa.com/gmos/about-genetically-modified-crops-in-the-us#:~:text=Approximately%2093%20percent%20of%20the,is%20from%20genetically%20modified%20seed.&text=Corn%20is%20the%20most%20widely,is%20from%20genetically%20modified%20seeds (last visited December 21, 2021).

(a)    **Corn** (Approx. 92% of U.S. crop is GMO) – Corn is genetically modified to be resistant to glyphosate or glufosinate herbicides.   Most GM-corn is used for human consumption.   In food products, GM-corn crop is used to produce corn flour, meal, oil, starch, modified food starch, corn gluten, corn syrup, and sweeteners such as fructose, dextrose, glucose and modified come from corn.   Genetically modified corn has been linked to health problems, including weight gain and organ disruption.

(b)    **Soybeans** (Approx. 94% of U.S. crop is GMO) – Soybeans are the most important crop worldwide for producing oil and protein.   Soybean and its processed derivatives are used in a multitude of food, groceries, supplements, and cosmetics.   Additionally, the remaining soy mass is used as protein-rich animal feed for fish, poultry, pigs, and beef.   Tolerance to herbicides is by far the most important commercial characteristic of GM-soybeans.   So, not only are soybeans a genetically engineered food crop, but farmers are also forced to use more and more pesticides to combat adaptive super bugs and super weeds, thereby creating additional health concerns for consumers.

(c)    **Sugar Beets** (Approx. 95% of U.S. crop is GMO) – Sugar Beets are genetically engineered to be RoundUp ready, like corn.   GM-sugar beets are used in refined sugar production, and the leftover fiber is used to feed animals at Concentrated Animal Feeding Operations ("CAFO").[5]

16.    Thus, any of the ingredients derived from domestically produced canola, corn, peas, rice, or soybeans are highly likely to contain GMOs, notwithstanding Defendant's Non-GMO Claims or similar product label representations to the contrary.

**B.    "Non-GMO" Is A Highly Profitable Descriptor**

17.    Product packaging is a significant vehicle through which the purveyors of natural and organic food products communicate material that they believe, and reasonably expect, to be important to consumers in making purchasing decisions.

---

[5] *See GMO 101, A Practical Guide: Potential Sources of Genetically Engineered Ingredients in Food*, at 244; *id.* ("Anything not listed as 100% cane sugar is suspect.  Look for organic and non-GMO sweeteners, candy and chocolate products made with 100% cane sugar, evaporated cane juice or organic sugar, to avoid GM beet sugar.").

18.     The health food market is no longer a niche market.  Consumers have been increasingly health conscious since the 1970s.  They seek out and covet food products that are natural and healthy and look for labels that convey these qualities in the foods they choose to purchase.  According to *Natural Foods Merchandiser*, a leading information provider for the natural, organic, and health food industry, the natural food industry enjoyed over $166 billion in revenue in 2019.  This means that since 2010, the natural food industry has more than doubled in size since it hit $81 billion in 2010.  Consumer demand for non-GMO foods is expected to rapidly increase into the next decade as well.

19.     The designation "non-GMO" appeals to consumers for its health attributes.  This designation also appeals to reasonable consumers' interest in protecting the environment, promoting sustainable living and local farming, and minimizing people's and the Earth's exposure to pesticides and other toxins.

20.     Any doubt about the money generating power of natural and healthy foods is dispelled by the entry and success of large conglomerates in the health food market.  For example, the well-known *Kashi* brand is owned by *Kellogg*, while *PepsiCo* has recently acquired the natural food company, *Be&Cheery*, for $705 million.  Additionally, the *Odwalla* brand has flourished and expanded significantly since its purchase by the *Coca-Cola Company* in 2001 for $181 million.

21.     Indeed, Defendant has acknowledged that, "You asked, we listened.  GERBER GOOD START formulas are now all non-GMO."[6]  Building on this point, Defendant remarked that "[b]ased on feedback from parents looking for more non-GM product options, we decided to make our formulas without the use of genetically modified ingredients."[7]

**C.     Consumer's Understanding of GMOs and Non-GMO Claims**

22.     While the abbreviated term "GMO" may generally refer to genetically modified organisms, when used in food marketing and labeling, terms like "non-GMO" and "GMO free" (which are reasonably understood by consumers to be synonymous[8]) have a broader meaning to

---

[6] Katiraee *et al.*, *supra* note 2.

[7] *Id.*

[8] In November 2015, the Food and Drug Administration ("FDA") issued guidelines on the labeling of foods derived from genetically engineered plants and grouped the terms "*GMO free*," *GE free*,"

consumers in that they convey food products that do not contain and are not sourced or derived from genetically engineered foods and methods, such as genetically engineered corn that ends up in corn syrup and beef from a cow that was raised on a diet of genetically engineered or modified food. Consumers have this understanding because of educational efforts by "non-GMO" consumer information sources and certification agencies as well as government authorities.  The successful results of their efforts to develop a consumer understanding of "non-GMO" and related terms in this manner are demonstrated by market research surveys as discussed below.

23.     The Non-GMO Project, for example, serves as one of the leading educational providers for consumers given its unique status as North America's "only third party verification and labeling for non-GMO food and products."  In response to increased use of GMOs, the Non-GMO Project was formed in the early 2000s with the goal of "creating a standardized meaning of non-GMO for the North American food industry."  Because of the Non-GMO Project's work with companies and food producers, through its Independent Verification Program, its Non-GMO Project Verified seal is now found on over 50,000 food products and with 3,000 participating brands.[9]  Further, it makes significant educational outreach efforts through its Non-GMO Project and LivingNonGMO.org websites.  Combined, these websites are host to over 200 million visits a year.  Consumers thus readily and understandably associate the terms "GMO", "non-GMO," and similar marketing claims, consistently with definitions set by the Non-GMO Project.

---

"*does not contain GMOs*," "*non-GMO*" "*and similar claims*" together.  U.S. Food and Drug Administration, *Guidance for Industry: Voluntary Labeling Indicating Whether Foods Have or Have Not Been Derived from Genetically Engineered Plants* (Mar. 2019), *available at* http://www.fda.gov/food/guidanceregulation/guidancedocumentsregulatoryinformation/ucm05909 8.htm#references (emphasis in original).  The FDA also warned that the term "free" that is associated with these similar claims "conveys zero or total absence" of ingredients derived through biotechnology and that these type of claims are "problematic" due to the challenges of substantiating such claims.  *Id*.  Thus, the FDA took care to appropriately group these commonly used "non-GMO" related labeling terms in the same fashion consumers do, demonstrating that "non-GMO," "does not contain GMOs," and "GMO free" have an identical and synonymous meaning to consumers.  The FDA also points out that the while the "O" in the acronym GMO generally refers to the word "organism" because an entire organism is generally not contained in a food (microorganisms in the dairy product yogurt being a cited exception), GMO is generally "read as meaning that the food was not *derived from* a genetically modified organism, such as a plant that has been genetically engineered."  *Id*. (emphasis in original).

[9] *See* The Non-GMO Project, *Verification FAQs*, https://www.nongmoproject.org/product-verification/verification-faqs/ (last accessed Oct. 18, 2021).

---

24.     Accordingly, consumers understand that any product or ingredient that is contaminated by or with GMOs is not "non-GMO."  And, the Non-GMO Project specifically extends its definition of "Non-GMO or No-GM" to any "plant, animal, or other organism whose genetic structure has not been altered by gene splicing" *and* to "a process or product that does not employ GM processes or inputs."[10]  Per the consumers' leading industry source, the Non-GMO Project states that "animal feed commonly contains High-Risk Inputs" in the form of genetically modified or engineered feed.  As a result, animal food products (such as meat, poultry, and dairy) are included on the Non-GMO Project's list of High-Risk ingredients.  For animal products to be properly labeled as "non-GMO," they must meet a number of stringent requirements, including that the animals and poultry be fed seed that is less than 5% GMO for various periods of the animal's life (including the entire life for meat animals other than poultry).  Other GMO awareness campaigns similarly advise consumers that to avoid GMOs they should avoid "meat, eggs, and dairy products that have eaten GMO feed" furthering the consumer understanding that "non-GMO" and related marketing, labeling, and advertising claims indicate to consumers that the animal products were not raised on genetically modified feed.[11]

25.     The federal government has also taken steps to adopt standards that assist companies and consumers with understanding that "non-GMO" labeling means that animal products are not raised on GMO derived feed.  For example, in mid-2013, the U.S. Department of Agricultures' Food Safety and Inspection Service, tasked with regulating the safety and proper labeling of meat, poultry, and egg products, approved the Non-GMO Project Verified label claim for meat and liquid egg products.[12]  These government efforts are intended to inform consumers that the animal was not raised on a diet that consists of genetically engineered ingredients, like

---

[10] The Non-GMO Project, *Non-GMO Project Standard* (Dec. 30, 2020), at 24, *available at* https://www.nongmoproject.org/wp-content/uploads/Non-GMO-Project-Standard-Version-16.pdf (last accessed Oct. 18, 2021).

[11] GMO Awareness, *Overview*, https://gmo-awareness.com/avoid-list/overview/ (last accessed Oct. 18, 2021).

[12] *See* Food Liability Law, *USDA Approves Non-GMO Label Claim for Meat and Egg Products* (Jul. 11, 2013), http://www.foodliabilitylaw.com/2013/07/articles/legislation-and-regulation/food-labeling/usda-approves-non-gmo-label-claim-for-meat-and-egg-products/.

---

corn, soy, and alfalfa.  Accordingly, consumers understandably associate advertising or labeling with the terms "non-GMO" or "GMO free" with products whose ingredients have not been tainted by GMOs or sourced from animals fed with GMOs.

26.    Market research also supports the fact that consumers understand and expect that advertisements and labeling of "non-GMO," "GMO free," or related claims have similar meanings and would not apply to foods sourced from animals fed with a GMO or a genetically engineered diet.  For example, a poll of Ohio voters by Public Policy Polling in December 2015 indicated that 76% of consumers would "[e]xpect that a dairy product labeled as "non-GMO" was made using milk from cows that had not been fed any genetically modified feed."[13]  Only 11% of respondents would not expect such a product to come from cows fed only with non-GMO feed.[14]

27.    As these poll results indicate, "consumer awareness of GMOs is almost universal at 97%."[15]  Consumers reasonably understand food advertised or labeled as "non-GMO," "GMO free," "does not contain GMOs," or other similar claims only apply to food that (1) does not contain GMOs and is not sourced from, or derived from any GMOs; and (2) does not contain animal products such as meat, poultry, pork and dairy that have a diet of GMO feed, GMO contaminated feed and/or genetically modified or engineered feed.  Consumers also understand that the term "food" applies broadly to food *and* drink, which is also how the FDA defines it.  21 U.S.C. § 321(f)(1).

**D.    Consumers Perceive GMOs As Negative And Unhealthy**

28.    Today, genetically modified crops are used in biological and medical research, production of pharmaceutical drugs, experimental medicine, and agriculture.  Such crops are engineered to, among other things, resist certain pests, diseases, or environmental conditions,

---

[13] *See* The Mellman Group, "Nearly All Voters Continue to Want GMO Foods Labeled," (Nov. 23, 2015) http://4bgr3aepis44c9bxt1ulxsyq.wpengine.netdna-cdn.com/wp-content/uploads/2015/12/15memn20-JLI-d6.pdf (last accessed Oct. 18, 2021).

[14] *See also* Center for Food Safety, *U.S. Polls On GE Food Labeling* (listing other relevant surveys regard GMO food labeling and consumer preferences).

[15] "Consumer Awareness of GMOs Continues to Soar," Non-GMO Project (Aug. 7, 2018), https://www.nongmoproject.org/blog/consumer-awareness-of-gmos-continues-to-soar/ (last accessed Oct. 23, 2021).

---

reduce spoilage, increase size and yield, taste and look better, and resist chemical treatments. In the United States, 94% of the planted area of soybeans, 95% of cotton, and 92% of corn are genetically modified varieties.[16]

29. Since 1996, farmers in animal agriculture (including poultry) have optimized GMOs by feeding genetically modified grains (corn) and oilseeds (soybean) to their flocks and herds.[17] Because more than 90% of the corn and soybeans in the United States are raised from genetically modified seeds, almost all corn and soybean used in conventional livestock and poultry feed is genetically modified. In addition, other genetically modified crops such as cotton, canola, sugar beets, and alfalfa are commonly used in animal feed.[18] Consequently, most meat and dairy products are contaminated with GMOs due to the feed consumed by livestock and poultry and cannot be labeled as "non-GMO" without deceiving consumers. Because the safety or health impact of food and other goods derived from genetically modified crops has been and continues to be hotly debated[19], it is no surprise that according to a Pew Research Center survey, only 37% of the general public believes that "it is generally safe to eat genetically modified (GM) foods."[20]

30. While the potential environmental and health impact of GMOs has been the subject of much scrutiny and debate within the food and science industries, Defendant and other businesses

---

[16] United States Department of Agriculture Economic Research Service, *Adoption of Genetically Engineered Crops in the U.S.*(July 9, 2015), http://www.ers.usda.gov/data-products/adoption-of-genetically-engineered-crops-in-the-us.aspx.

[17] *See* National Chicken Council, *Genetically Modified Organism (GMO) Use in the Chicken Industry* (July 5, 2013), http://www.nationalchickencouncil.org/genetically-modified-organism-gmo-use-in-the-chicken-industry/.

[18] *See* GMO Inside Blog, *How Pervasive are GMOs in Animal Feed?* (July 16, 2013), http://gmoinside.org/gmos-in-animal-feed/.

[19] *Compare, e.g.*, European Commission, *A Decade of EU-funded GMO Research* (2001-2010), http://ec.europa.eu/research/biosociety/pdf/a_decade_of_eu-funded_gmo_research.pdf (last accessed Mar. 11, 2016), *with* Non GMO Project, *GMO Facts*, http://www.nongmoproject.org/learn-more/ (last accessed Mar. 11, 2016) ("Meanwhile, a growing body of evidence connects GMOs with health problems, environmental damage and violation of farmers' and consumers' rights.").

[20] Pew Research Center, *Public and Scientists' Views on Science and Society* (Jan. 29, 2015), https://www.pewresearch.org/science/2015/01/29/public-and-scientists-views-on-science-and-society/ (last visited Oct. 28, 2021).

---

know customers attach an unhealthy, negative perception towards them.[21]  Defendant's Non-GMO Claims are specifically intended to manipulate consumers into avoiding GMOs, including animal food products raised on GMO feed, because of health and environmental concerns.

31.     As a result of GMO controversy and consumer concerns, companies have created an $11 billion (and fast growing) market for non-GMO products and consumers are willing to pay the higher costs associated with non-GMO products due to the negative perception of genetically modified foods and because GMO-free ingredients are often more expensive.[22]  And, there is no dispute that GMO labeling is a material and important issue to consumers.  In a November 2015 poll, 89% of likely voters in 2016 would support labeling of GMO foods.  And, 77% percent of those "strongly favored" such a requirement.  These poll results clearly show that Americans want to know if the food they are purchasing are non-GMO.  Thus, there is no dispute that GMO labeling is a material and important issue to consumers.[23]

**E.     Defendant's False, Misleading, And Deceptive Non-GMO Claims**

32.     In 2018, sales of baby food and infant formula amounted to $6.9 billion, a level that has more or less remained unchanged over the past three years.[24]  That same year, Gerber accounted for approximately 13% of the total sales in baby food and infant formula, or roughly $897 million.[25]  Accordingly, Defendant has an enormous incentive to further its market share in this area.

---

[21] *See, e.g., "Gerber's New Look,"* https://www.gerber.com/gerbers-new-look (last accessed Dec. 21, 2021) ("Our ambition is for all Fruit & Veggie baby foods to be certified to the Non-GMO Project Verified standard by 2018.").

[22] *See* Gluten Free Living, *GMO Free Comes at a Price, Gluten-Free Living* (Nov. 25, 2014), http://www.glutenfreeliving.com/gluten-free-lifestyle/non-gmo/gmo-free-comes-at-price/; The Mellman Group, Inc., *Voters Want GMO Food Labels Printed On Packaging*, http://4bgr3aepis44c9bxt1ulxsyq.wpengine.netdna-cdn.com/wp-content/uploads/2015/12/15memn20-JLI-d6.pdf (last accessed Oct. 18, 2021).

[23] The Mellman Group, Inc., *Voters Want GMO Food Labels Printed On Packaging*, http://4bgr3aepis44c9bxt1ulxsyq.wpengine.netdna-cdn.com/wp-content/uploads/2015/12/15memn20-JLI-d6.pdf (last accessed Oct. 18, 2021).

[24] Business Wire, "Baby Food Market in the United States, 2019 Report," (May 21, 2019), https://www.businesswire.com/news/home/20190531005441/en/Baby-Food-Market-in-the-United-States-2019-Report---ResearchAndMarkets.com (last accessed Dec. 21, 2021).

[25] *Id.*

---

33.     According to one study, behind the brand name, the presence of an "Organic / Non-GMO" label on infant formulas and toddler milk represent the second foremost factor that consumers consider when making their purchases.[26]   Therefore, product offerings that include the Non-GMO label on baby foods and infant formulas provides a significant avenue for growth.

34.     Recognizing this reality, Gerber rolled out its "Non-GMO" product line, "Gerber Good Start," on February 10, 2016.   As noted above, Defendant stated that "You asked, and we listened."[27]   In line with this sentiment, Defendant states directly on its website that "All Gerber foods made without genetically engineered ingredients are now labeled with either Gerber's Non-GMO seal or the Non-GMO Project Verified Seal, so keep an eye out!"   To this point, Defendant also states on its website that its "ambition is for all Fruit & Veggie baby foods to be certified to the Non-GMO Project Verified standard by 2018."

 

35.     Defendant failed to achieve this goal.   Moreover, implicit in Defendant's statement is the recognition that its own Non-GMO standard is inconsistent with that of the Non-GMO

---

[26] Tassneem Rajeh, "Provision of Added Value Infant Formula And Toddler Milk To Infants and Toddlers,"(2020), https://www.proquest.com/openview/4ca50d80afac71637c9c008cdd8daf3c/1?pq-origsite=gscholar&cbl=18750&diss=y (last accessed Dec. 21, 2021).

[27]

Project's standard. However, consumers are familiar with and have accepted the Non-GMO Project's more stringent standard as to what constitutes a "GMO" and whether a product can properly be considered to be a "Non-GMO" product. But significantly, none of the Products at issue bear the Non-GMO Project Verified Seal. Instead, Defendant has created its own seal, as follows:



36. Defendant's deceptive Non-GMO Claims (and seal) are intended to fool consumers into believing that Defendant's Products satisfy the Non-GMO Project's stringent standards, which they do not.

37. In addition to manufacturing its own seal, Defendant has engaged in a multi-media mass marketing and advertising campaign to inform consumers that it was going "non-GMO" since approximately February 2016, through various methods including claims on its website, social media, in-store signage at the brick-and-mortar retail locations where its Products are sold, and—most importantly—prominent Non-GMO claims affixed to the labeling and/or packaging of its Products.

38. These efforts, including Defendant's prominent use of its own Non-GMO label affixed to Product packaging, are intended to further Defendant's desire to appear as supporting healthy food for infants and toddlers, thereby increasing its share of the booming baby foods and infant formulas market and, correspondingly, the revenues it derives from that market.

39. However, rather than manufacture infant formulas that are "Non-GMO" as understood by reasonable consumers, Defendant has maintained its own "internal definition" and

has sought to deceive consumers by standing behind this definition rather than bringing the Products in conformity with reasonable consumers' understanding of that term.[28]

### F.    Defendant's Products Contain Genetically Modified Ingredients Despite Being Marketed As "Non-GMO"

40.    All of the Gerber Products at issue are substantially similar.  All varieties are manufactured in-house at Defendant's factories located in Cincinnati, Ohio.[29]  Moreover, the labels of all of the Gerber Products are substantially similar in that each Product contains an identical "Non-GMO" Claim featured prominently on the front of the Product's labeling and/or packaging. This claim is also prominently featured on the back of the Product's labeling just above the Nutrients list.    However, Defendant's Non-GMO claims are deceptive and misleading to reasonable consumers because: (1) Defendant's Products are in fact loaded with ingredients derived from GM-crops; and (2) Defendant's Products also contain protein and/or dairy sources derived from cows raised on GMO feed.  Even worse, none of the Product labels expressly state that the Products contain GMOs, and Defendant does not adequately disclose any of this information to consumers on its Product labels or on its website.

(a)    <u>Defendant's Products Contain Animal Byproducts That Are Not Non-GMO</u>: As set forth above, consumers understand the terms "non-GMO," "GMO free," and similar representations, to apply only to ingredients that do not come from animals fed with genetically engineered or GMO derived feed.    Defendant deceptively advertises, labels, and markets its Products as "Non-GMO" or "GMO free" even though *each* of the Products at issue in this case contains whey-based protein sources (among other dairy-based ingredients) – including whey protein isolate, whey protein concentrate, cultured whey protein concentrate, etc. – derived from animals (specifically, cows) that are fed with a genetically engineered or GMO-derived feed. Additionally, many Products also contain other dairy-based ingredients derived from cows raised

---

[28] Katiraee *et al.*, *supra* note 2.

[29] Vaibhav Sharda, "Where is Gerber baby food manufactured," *Chicago Food Whores*, (Oct. 28, 2021), https://www.chicagofoodwhores.com/where-is-gerber-baby-food-manufactured/ (last accessed Dec. 21, 2021).

on GMO feed, such as milk, nonfat dry milk, cultured nonfat dry milk, milk protein isolate, milk protein concentrate, whole milk, cultured skim milk, butterfat, and calcium caseinate.[30]

(b)    <u>Defendant's Products Contain Ingredients Derived From GM-Crops And Therefore Are Not Non-GMO</u>: As detailed below, Defendant's Products contain numerous ingredients derived from GM crops.  For instance, *each* of Defendant's Products contains soy protein isolate, an ingredient derived from GM soybean.  Most of Defendant's Products also contain ingredients derived from GM soybean and sugar beets.

41.    In addition to being derived from GMOs, many of the Products' ingredients are also synthetic, chemically synthesized, and/or highly processed to the point where they no longer resemble any natural source.  Thus, any food containing these synthetic and/or processed ingredients cannot be called "Non-GMO."

42.    Defendant's Products contain, without limitation, one or more of the following ingredients:

• **Ascorbic Acid**.  While ascorbic acid occurs naturally in certain foods, ascorbic acid used as a source of Vitamin C in foods is not naturally-occurring.  Rather, it is synthesized industrially from glucose through a combined chemical-organic process known as the Reichstein Process.  The Reichstein Process uses the following steps: (a) hydrogenation of D-glucose to D-sorbitol, an organic reaction with nickel as a catalyst under high temperature and high pressure; (b) Microbial oxidation or fermentation of sorbitol to L-sorbose with acetobacter at pH 4-6 and 30º C; (c) protection of the 4 hydroxyl groups in sorbose by formation of the acetal with acetone and an acid to Diacetone-L-sorbose (2,3:4,6-Diisopropyliden-α-L-sorbose); (d) organic oxidation with potassium permanganate followed by heating with water to yield 2-Keto-L-gulonic acid; and I a ring-closing step or gamma lactonization with removal of water.  As a food ingredient,

---

[30] *See* "Frequently Asked Questions," https://thinkproducts.com/en-us/faqs/ (noting that its whey proteins derive from cows raised on feed derived from GM-corn: "[The non-GMO project] requires that dairy cows not consume any genetically modified corn, … [and because it contains whey protein], our Lean Protein & Fiber product is not NGP-verified") (last visited Oct. 28, 2021); *see also id.* ("[T]he non-GMO project does not recognize the dairy proteins used in our bars as NGP verifiable.").

---

ascorbic acid typically is derived from corn-based glucose.[31]   Upon information and belief, Plaintiff alleges that ascorbic acid found in the Products is derived from GM corn.

- **Assorted Dairy Ingredients and Products** (including lactose, nonfat dry milk, cultured whey proteins, whole milk, etc.).  The United States currently devotes nearly 75 million acres of land to the production of soybeans, most of which are fed to animals.  Similarly, much of the nation's 80 to 90 million acres of corn is fed to livestock.  Since 85 to 95% of these crops are GMO, it is safe to assume – unless provided proper certification – that "normal" dairy products contain GMO ingredients in one form or another.  Thus, unless a product is USDA Certified Organic or has a Project Non-GMO Verified seal, "ALL dairy products can be assumed to come from commercial/industrial dairy sources (CA–O - concentrated animal feeding operations) whose cows are typically fed GM-corn, cottonseed, alfalfa[,] or soybean feed."[32]

---

[31] Notably, "[o]ver 90% of ascorbic acid in this country is manufactured at a facility in Nutley, New Jersey, owned by Hoffman-LaRoche, one of the world's biggest drug manufacturers[.] … Here ascorbic acid is made from a process involving cornstarch and volatile acids.  Most U.S. vitamin companies then buy the bulk ascorbic acid from this single facility.  After that, marketing takes over.  Each company makes its own labels, its own claims, and its own formulations, each one claiming to have the superior form of vitamin C, even though it all came from the same place[.]"  Chef Alain Braux, *GMO 101, A Practical Guide*, 89 (2014), *available at* https://play.google.com/books/reader?id=YeHXBQAAQBAJ&pg=GBS.PA2&hl=en (last visited Oct. 28, 2021).

*See also* Powbab, *"What is Ascorbic Acid Vitamin C?,"* https://www.powbab.com/blogs/news/what-is-ascorbic-acid-vitamin-c ("[A]scorbic acid is typically made from corn derivatives.  Most corn in the US is genetically modified (GMO).  Unless the product or corn is verified by the Non-GMO Project Verified, in almost all cases, it is genetically modified.  Genetic modification changes DNA structure, and this impacts our body when we consume it.").

[32] *See* Chef Alain Braux, *GMO 101, A Practical Guide: Potential Sources of Genetically Engineered Ingredients in Food*, at 184, *available at* https://play.google.com/books/reader?id=YeHXBQAAQBAJ&pg=GBS.PA2&hl=en.  As Chef Alain Braux, award-winning executive chef and multiple award-winning food and health author, further explained:

> The United States currently devotes nearly 75 million acres of land to the production of soybeans, most of which are fed to animals.  Similarly, much of the nation's 80 to 90 million acres of corn is fed to livestock.  Since 85 to 95% of these crops are GMO, it is safe to assume – unless provided proper certification – that "normal" dairy products contain GMO ingredients in one form or another.

> In the United States more than 99% of farm animals come from factory farming.  Conventional cattle grown in [concentrated animal feeding operations ('CAFOs')] is fed what is called concentrated feed.  It can mean any number of things, but the base food is always a grain slurry, typically of GMO corn and corn byproducts, GMO soy and soy hulls, and other grains and cereals.  CAFO nutritionists sometimes also include GM cotton byproducts and GM sugar beets in their cows' diet.

---

- **Brown Sugar**.  Brown sugar can be made from either sugar beets, a GM crop, or contain caramel color from corn syrup, another GM crop.

- **Calcium Caseinate.**  Calcium caseinate is a protein derived from the casein in milk.  Manufacturers produce calcium caseinate by changing the pH of cow's milk to neutral or acidic.  In this state, casein becomes insoluble in water; this allows manufacturers to isolate it from the other proteins in milk.  After this separation, manufacturers combine casein with calcium hydroxide at high alkaline levels and dry the protein.  Thus, while casein is natural, calcium caseinate is a synthetic additive.  It is commonly used as a food additive in nutritional food, and it also acts as an emulsifier, thickener or stabilizer.[33]

- **Casein**.  Casein is the name given to a larger group of proteins known as phosphoproteins, which represent as much as 80 percent of the proteins in cows' milk.  It is a white, tasteless, odorless protein precipitated from dairy milk by rennin.  It is the basis of cheese and is used to make plastics, adhesives, paints, and foods.  All dairy products from bovines, and the vast majority of these animals (including the cows from which the casein in Defendant's Products was derived[34]) are fed corn, soy, or cotton feed (all GM crops).

- **Citric Acid**.  Citric acid was the first additive that was produced on a large scale biotechnically.  Most citric acid found in food is a commodity chemical produced by feeding simple carbohydrates to *Aspergillus niger* mold and then processing the resulting fermented compound.  Citric acid-producing microorganisms grow on culture media that usually contain molasses (which is derived from sugar beet, a GM crop) and/or glucose (which usually comes from corn, another GM crop).  Calcium hydroxide and sulfuric acid are often used in processing.[35]

---

*Id.* (emphasis added).

[33] *See* FoodAdditives.net, *What is Calcium Caseinate in Food and Uses: A Protein and Calcium supplement* (Jan. 6, 2020), https://foodadditives.net/emulsifiers/calcium-caseinate/ (last visited Oct. 28, 2021); *see also* Rafael Jimenez-Flores, *Genetic Engineering of the Caseins to Modify the Behavior of Milk During Processing: A Review*, 71 J. Dairy Sci. (1988), 2640, https://www.journalofdairyscience.org/article/S0022-0302(88)79857-4/pdf.

[34] *See* Frequently Asked Questions, https://thinkproducts.com/en-us/faqs/ (noting that its whey proteins derive from cows raised on feed derived from GM-corn) (last visited Oct. 28, 2021).

[35] *See* Chef Alain Braux, *GMO 101, A Practical Guide*, 103 (2014); *see also* New Hope Network, *Is citric acid natural* (Dec. 19, 2004), *available at* https://www.newhope.com/ingredients-general/is-citric-acid-natural (last visited Oct. 28, 2021).

- **Corn Starch**.  Corn starch is starch made from corn.  As noted above, approximately 92% of corn grown in the United States is GMO.  More specifically, corn starch is derived from the white endosperm at the heart of a corn kernel.  To get to the endosperm, the kernels are processed to remove the outer layers and shell.  The endosperms are then ground into a fine, white, gritty power.

- **Cultured Dairy Products** include an assortment of dairy foods that have been fermented with lactic acid bacteria such as *Lactobacillus*, *Lactococcus*, and *Leuconostoc*.

- **Galacto-Oligosaccharides**.  The industrial production of galacto-oligosaccharides ("GOS") is achieved via ß-galactosidase catalyzed enzymatic trans-galactolysis. The reaction results in a mixture of GOS factions, non-reacted lactose, glucose, and small amounts of galactose as a by-product.  The structure and degree of polymerization of GOS largely depends on the enzyme facilitating the synthesis.  Industrial GOS production is carried out by GRAS-or QPS-certified enzymes.

- **Inositol**.  Commercial production of inositol follows a two-step process in which (1) phytic acid is extracted from plants, such as corn or rice, and (2) one of several chemical processes is used to transform the phytic acid into inositol.  The phytic acid is extracted by soaking the vegetable material in a dilute acid solution, such as hydrochloric acid or sulfuric acid, and then using filtration or another mechanical separation technique followed by precipitation using an alkali reagent and additional mechanical separation.  The extracted phytin is then converted to inositol as the phytin is hydrolyzed with a strong sulfuric acid solution and then steamed pressured. The result is a synthetic that is industrially manufactured.

- **Mixed Tocopheryls (i.e., D-Alpha Tocopheryl Acetate) / Vitamin E**.  D-Alpha Tocopheryl Acetate, a synthetic, water-soluble form of Vitamin E, is often found in processed foods as a preservative.

- **Soluble Corn Fiber**. Soluble corn fiber, also referred to as **corn maltodextrin**, is a non-digestible fiber made from GMO corn syrup, which is chemically processed.  It is produced using enzymatic hydrolysis, a process that involves breaking the

chemical bonds of a molecule using enzymes.[36]   During this process, it is then heated, hydrolyzed, and filtered into a white tasteless powder.  Commercially, soluble corn fiber used in food products to thicken processed foods like protein bars, cereals, baked goods, dairy products, and salad dressings, and as a sweetener in place of sugar.

- **Soy Lecithin**. Soy lecithin, or lecithin, is a processed by-product of the production of soybean oil, which comes from GM soybean.  It is derived from the sludge left after crude oil undergoes a degumming process.  More specifically, to produce soybean oil, soybeans are ground into small fragments and then flakes.  The flakes are then combined with hexane or another similar solvent.  The resulting product is subjected to heat to remove the solvents.  Clarified soybean oil is then produced when the gum and water are mechanically separated from the crude soybean oil.  The waste sludge or gum left remaining is then dried to produce lecithin.

- **Soy Oil**.  Soy or soybean oil is made by extracting oil from whole soybeans. This process involves dehulling and crushing soybeans, adjusting the soybeans for moisture content, and heating the soybeans to between 140-190 ºF.  The soybeans are then rolled into flakes which are then put in a percolation extractor and immerged with a solvent, normally hexane.  The hexane is then separate from the soybean oil in evaporators.  The evaporated hexane is recovered and returned to the extraction process.

- **Soy Protein**.  Soy proteins derive from GM soybeans and are mainly used as ingredients in formulated foods.  It is made from soybean meal that has been dehulled and defatted. Dehulled and defatted soybeans are processed into three kinds of high protein commercial products: soy flour, soy protein concentrate (SPC), and soy protein isolate (SPI).[37]   As shown below, each of Defendant's Products lists one or both of the latter two forms of GMO soy protein as a primary ingredient.

---

[36] *See* Healthline, *Is Soluble Corn Fiber Good for You? Benefits and Side Effects* (Mar. 18, 2021), https://www.healthline.com/nutrition/soluble-corn-fiber (last visited Oct. 28, 2021); *see also* Dr. David Friedman's Health Blog, *Are You Eating Soluble Corn Fiber?*, https://doctordavidfriedman.com/blog/are-you-eating-soluble-corn-fiber (last visited Oct. 28, 2021).

[37] *See* E.W. Lucas, et al., *Soy Protein Products: Processing And Use*, 125 J. Nutr (1995), 573S, *at* https://pubmed.ncbi.nlm.nih.gov/7884536/; *see also* G N Bookwalter, *Soy Protein Utilization In Food Systems*, 105 Adv Exp Med Biol (1978), 749, *at* https://pubmed.ncbi.nlm.nih.gov/569429/.

---

- **Soy Protein Isolate (SPI)**. SPI is protein from GM soybeans that has been isolated from all the other ingredients in soy via chemical engineering.[38] To do this, the soybeans are first washed with an acid and then neutralized in an alkaline solution. During this process, the soybean is chemically modified, processed, and filled with pesticides. Thus, SPIs "are genetically modified foods."[39] The extraction process often leaves behind residue from chemicals and metals like hexane or aluminum, and it also strips the powder of the zinc and iron typically present in soybean products. At the end of the entire SPI-making process, what remains is a dry powder that is about 90-95% protein and nearly carbohydrate- and fat-free. Additionally, SPI also contains phytates, also called anti-nutrients, which reduce the body's ability to absorb iron and zinc. SPI has been used since 1959 in foods for its functional properties. It is often used in products like protein bars, flour, cereal, and meat and dairy alternatives.[40]

- **Sucrose**. Sucrose is obtained from sugar beets. The glucose and fructose units are joined by an acetal oxygen bridge in the alpha-1 on the glucose and beta-2 on the fructose orientation. To do this, the sugar beets are washed, sliced, and soaked in hot water to separate the sugar-containing juice from the beet fiber. The sugar-laden juice is purified, filtered, and concentrated and then dried in a series of steps to crystalize and refine the material. . .

- **Sugar**. If not specifically identified on a product label as cane sugar, sugar is derived from corn or sugar beet – both GM crops.

- **Vegetable Glycerin.** Vegetable glycerin, also known as glycerol or glycerine, can be derived from the refining of biofuels from corn or sugar beet, both GM crops. It is produced commercially the hydrogenolysis of carbohydrates or from petrochemicals. In food

---

[38] Specifically, as the Product labels make clear, the SPI in Defendant's Products is produced through enzymatic hydrolysis. *See infra* at ¶¶ 44-75 (product label images listing "Enzymatically Hydrolyzed Whey Protein Isolate (From Cow's Milk)" as ingredient in nutritional panel).

[39] Eat This, Not That!, *What is Soy Protein Isolate and Is It Bad For You?* (Jan. 4, 2020), https://www.eatthis.com/soy-protein-isolate/ (last visited Oct. 28, 2021) ("If you have an inflammatory condition or otherwise opt to stay away from GMO's, you probably want to steer clear of SPI.").

[40] *Id*.; *see also* Women's Health, *"Soy Protein Isolate" Is In So. Many. Things. But Is It Healthy?* (May 28, 2019), https://www.womenshealthmag.com/food/a27559289/soy-isolate-protein/ (last visited Oct. 28, 2021).

products, vegetable glycerin serves as a humectant, solvent, sweetener, and preservative, or as a filler in commercially prepared low-fat foods.  Here, the vegetable glycerin contained in a number of think! Products "is derived from plant sources" (*i.e.*, GM crops), and it "is used as a humectant (an ingredient used to preserve the moisture content of the bar) and to help maintain a soft texture in the core of the [Products]."[41]

•   **Vitamin A Acetate**.  Vitamin A Acetate is a yellow, fat-soluble substance that is unstable in its pure alcohol form.  Consequently, for commercial food production, it is chemically produced and administered as esters also known as retinyl acetate or palmitate.

•   **Whey**.  The byproduct of cheese-producing industries, cheese whey, is considered as an environmental pollutant due to its high concentrations of biochemical oxygen demand ("BOD") and chemical oxygen demand ("COD").  As demand for milk-derived products is increasing, it leads to increased production of whey, which poses a serious management problem. To overcome this problem, various technological approaches have been employed to convert whey into value-added products.  These technological advancements have enhanced whey utilization and about 50% of the total produced whey is now transformed into value-added products including but not limited to whey powder, whey protein, and probiotics.  Whey can be biotransformed into proteinaceous feed and food-grade bioprotein/single cell protein through fermentation, directly processed to obtain whey proteins, or transformed into bioactive peptides via enzymatic or fermentation processes.[42]

•   **Whey Protein**.  Whey protein is made with the protein isolated from the liquid by-product of cheese.  Commercially produced whey protein from cow's milk typically comes in four major forms: whey protein isolate ("WPI"), whey protein concentrate ("WPC"), whey protein hydrolysate ("WPH"), and native whey protein.  WPCs are 29–89 percent protein by weight.  Several of Defendant's Product labels list WPCs as a primary ingredient.

---

[41] Frequently Asked Questions, https://thinkproducts.com/en-us/faqs/ (last visited Oct. 28, 2021).

[42] Jay Shankar Singh Yadav, *Cheese whey: A potential resource to transform into bioprotein, functional/nutritional proteins and bioactive peptides*, 33:6(1) Biotechnol. Adv. (2015), 756, https://www.sciencedirect.com/science/article/abs/pii/S073497501530015X.

1    43.    Accordingly, Defendant's Non-GMO Claims about its Products are deceptive and

2  misleading to reasonable consumers.

3    44.    For example, one of Defendant's Products that was purchased by Plaintiff – "Gerber

4  Good Start Soy 2 Powder Infant & Toddler Formula" – prominently represents that it is a "NON

5  GMO" Product.  However, the Product's primary ingredient, corn maltodextrin (*i.e.*, soluble corn

6  fiber), is a chemically processed non-digestible fiber made from GMO corn syrup, which is derived

7  from GM-corn.  The Product also contains several other genetically modified ingredients, including

8  vegetable oils derived from GM-soybean (i.e., soybean oil), as well as enzymatically hydrolyzed

9  soy protein isolate, sucrose, soy lecithin, inositol, alpha-tocopheryl acetate, mixed tocopherols, and

10 citric acid:



**INGREDIENTS:** CORN MALTODEXTRIN, VEGETABLE OILS (PALM OLEIN, SOY, COCONUT, AND HIGH OLEIC SAFFLOWER OR HIGH OLEIC SUNFLOWER OIL), ENZYMATICALLY HYDROLYZED SOY PROTEIN ISOLATE, SUCROSE, AND LESS THAN 2% OF: CALCIUM PHOSPHATE, SODIUM CITRATE, SOY LECITHIN, POTASSIUM CITRATE, CALCIUM CHLORIDE, SODIUM ASCORBATE, POTASSIUM PHOSPHATE, CHOLINE CHLORIDE, MAGNESIUM CHLORIDE, *M. ALPINA* OIL*, *C. COHNII* OIL**, L-METHIONINE, POTASSIUM HYDROXIDE, CALCIUM CITRATE, TAURINE, INOSITOL, FERROUS SULFATE, ALPHA-TOCOPHERYL ACETATE, ZINC SULFATE, MIXED TOCOPHEROLS, ASCORBYL PALMITATE, L-CARNITINE, NIACINAMIDE, CALCIUM PANTOTHENATE, RIBOFLAVIN, THIAMINE MONONITRATE, VITAMIN A ACETATE, COPPER SULFATE, PYRIDOXINE HYDROCHLORIDE, MANGANESE SULFATE, CITRIC ACID, POTASSIUM IODIDE, FOLIC ACID, PHYLLOQUINONE, BIOTIN, SODIUM SELENATE, VITAMIN D3, VITAMIN B12.
**CONTAINS: SOY.**

23   45.    Similarly, Defendant's "Gerber Good Start Soy Infant Formula" Products (including

24 powder, ready to feed, and concentrated liquid formats) prominently represent they are "NON

25 GMO" Products.  However, the Products contain several genetically modified ingredients,

26 including corn maltodextrin, soybean oil, enzymatically hydrolyzed soy protein isolate, sucrose,

ascorbic acid, soy lecithin, inositol, alpha-tocopheryl acetate, and mixed tocopherols.  The ready to

feed, and concentrated liquid formats also contain cornstarch:



**INGREDIENTS:** CORN MALTODEXTRIN, VEGETABLE OILS (PALM OLEIN, SOY, COCONUT, AND HIGH-OLEIC SAFFLOWER OR HIGH-OLEIC SUNFLOWER), ENZYMATICALLY HYDROLYZED SOY PROTEIN ISOLATE, SUCROSE, AND LESS THAN 2% OF: CALCIUM PHOSPHATE, POTASSIUM CITRATE, SODIUM CITRATE, CALCIUM CITRATE, *M. ALPINA* OIL*, *C. COHNII* OIL**, MAGNESIUM CHLORIDE, CALCIUM CHLORIDE, POTASSIUM CHLORIDE, FERROUS SULFATE, ZINC SULFATE, COPPER SULFATE, POTASSIUM IODIDE, SODIUM SELENATE, SOY LECITHIN, SODIUM ASCORBATE, CHOLINE CHLORIDE, INOSITOL, ALPHA-TOCOPHERYL ACETATE, NIACINAMIDE, CALCIUM PANTOTHENATE, VITAMIN A ACETATE, RIBOFLAVIN, THIAMINE MONONITRATE, PYRIDOXINE HYDROCHLORIDE, FOLIC ACID, BIOTIN, PHYLLOQUINONE, VITAMIN D$_3$, VITAMIN B$_{12}$, ASCORBYL PALMITATE, MIXED TOCOPHEROLS, L-METHIONINE, TAURINE, L-CARNITINE.
**CONTAINS: SOY.**

///

///

///

1
2
3
4
5
6
7
8
9
10
11



**INGREDIENTS:** WATER, CORN MALTODEXTRIN, VEGETABLE OILS (PALM OLEIN, SOY, COCONUT, AND HIGH-OLEIC SAFFLOWER OR HIGH-OLEIC SUNFLOWER), ENZYMATICALLY HYDROLYZED SOY PROTEIN ISOLATE, AND LESS THAN 1.5% OF: SUCROSE, CORNSTARCH, CALCIUM PHOSPHATE, POTASSIUM CITRATE, SODIUM CITRATE, CALCIUM CITRATE, *M. ALPINA* OIL\*, *C. COHNII* OIL\*\*, MAGNESIUM CHLORIDE, CALCIUM CHLORIDE, POTASSIUM CHLORIDE, FERROUS SULFATE, ZINC SULFATE, COPPER SULFATE, POTASSIUM IODIDE, SODIUM SELENATE, SOY LECITHIN, MONOGLYCERIDES, SODIUM ASCORBATE, CHOLINE CHLORIDE, INOSITOL, ALPHA-TOCOPHERYL ACETATE, NIACINAMIDE, CALCIUM PANTOTHENATE, VITAMIN A ACETATE, RIBOFLAVIN, THIAMINE MONONITRATE, PYRIDOXINE HYDROCHLORIDE, FOLIC ACID, BIOTIN, PHYLLOQUINONE, VITAMIN D₃, VITAMIN B₁₂, L-METHIONINE, CARRAGEENAN, TAURINE, L-CARNITINE.

**CONTAINS: SOY.**

12
13
14
15
16
17
18
19
20
21
22
23
24
25





26  ///

27  ///

28  ///

1     46.     Further, "Gerber Good Start Gentle Infant Formula" prominently represents that it is

2     a "NON GMO" Product.  However, the Product contains several genetically modified ingredients,

3     including lactose, soy oil, whey protein concentrate, nonfat dry milk, ascorbic acid, soy lecithin,

4     corn maltodextrin, inositol, alpha-tocopheryl acetate, mixed tocopherols, and *B. lactis* cultures:




20    ///

21    ///

22    ///

23    ///

24    ///

25    ///

26    ///

27    ///

28

47.     Likewise, Defendant's "Gerber Good Start GentlePro Infant Formula" Products (including powder, ready to feed, and concentrate liquid formats) prominently represents that they are "NON GMO" Products.   However, the Products contains several genetically modified ingredients, including whey protein concentrate (from cow's milk, enzymatically hydrolyzed and reduced in minerals), soy oil, lactose, and corn maltodextrin, as well as ascorbic acid, alpha-tocopheryl acetate, mixed tocopherols, and citric acid.   The powder format also contains inositol, while the ready-to-feed and concentrated liquid formats also contain galacto-oligosaccharides, a prebiotic sourced from cow's milk:









48.    Defendant's "Gerber Good Start GentlePro 2 Powder Infant Formula" prominently represents that it is a "NON GMO" Product.  However, the Product contains several genetically modified ingredients, including whey protein concentrate (from cow's milk, enzymatically hydrolyzed and reduced in minerals), soy oil, lactose, and corn maltodextrin, as well as ascorbic acid, citric acid, inositol, alpha-tocopheryl acetate, and mixed tocopherols:



49.    Defendant's "Gerber Good Start SoothePro Powder Infant Formula" prominently represents that it is a "NON GMO" Product.  However, the Product contains several genetically modified ingredients, including corn maltodextrin, whey protein concentrate (from cow's milk, enzymatically hydrolyzed and reduced in minerals), and soy oil, as well as citric acid, alpha-tocopheryl acetate, mixed tocopherols, soy lecithin, and *lactobacillus reuteri* (DSM 17938) cultures (*i.e.*, a cultured dairy product that has been fermented with lactic acid bacteria, specifically *lactobacillus*):

///

///

1
2
3
4
5
6
7
8
9
10
11



**INGREDIENTS:** CORN MALTODEXTRIN, WHEY PROTEIN CONCENTRATE (FROM MILK, ENZYMATICALLY HYDROLYZED, REDUCED IN MINERALS), VEGETABLE OILS (PALM OLEIN, SOY, COCONUT, HIGH OLEIC SAFFLOWER OR HIGH OLEIC SUNFLOWER), AND LESS THAN 2% OF: POTASSIUM HYDROXIDE, CALCIUM CHLORIDE, CALCIUM PHOSPHATE, POTASSIUM PHOSPHATE, SODIUM ASCORBATE, SODIUM CITRATE, CHOLINE BITARTRATE, 2'-O-FUCOSYLLACTOSE*, *M. ALPINA* OIL**, *C. COHNII* OIL***, CITRIC ACID, MAGNESIUM CHLORIDE, TAURINE, NUCLEOTIDES (CYTIDINE 5'-MONOPHOSPHATE, DISODIUM URIDINE 5'-MONOPHOSPHATE, ADENOSINE 5'-MONOPHOSPHATE, DISODIUM GUANOSINE 5'-MONOPHOSPHATE), INOSITOL, FERROUS SULFATE, ALPHA-TOCOPHERYL ACETATE, MIXED TOCOPHEROLS, ASCORBYL PALMITATE, ZINC SULFATE, NIACINAMIDE, CALCIUM PANTOTHENATE, L-CARNITINE, COPPER SULFATE, VITAMIN A ACETATE, THIAMINE MONONITRATE, RIBOFLAVIN, PYRIDOXINE HYDROCHLORIDE, MANGANESE SULFATE, POTASSIUM IODIDE, FOLIC ACID, PHYLLOQUINONE, BIOTIN, SODIUM SELENATE, VITAMIN D$_3$, VITAMIN B$_{12}$, SOY LECITHIN, *LACTOBACILLUS REUTERI* (DSM 17938) CULTURES. **CONTAINS: MILK AND SOY.**

12   50.   Defendant's "Gerber Good Start Gentle Supreme A2 Powder Infant Formula"
13  prominently represents that it is a "NON GMO" Product.  However, the Product contains several
14  genetically modified ingredients, including lactose, soy oil, whey protein concentrate, and nonfat
15  dry milk (*i.e.*, A2 beta (β)-casein milk protein from cow's milk), as well as soy lecithin, corn
16  maltodextrin, *lactobacillus reuteri* (DSM 17938) cultures, inositol, alpha-tocopheryl acetate, mixed
17  tocopherols, and citric acid:

18
19
20
21
22
23
24
25
26
27
28



**INGREDIENTS:** LACTOSE, VEGETABLE OILS (PALM OLEIN, SOY, COCONUT, HIGH-OLEIC SAFFLOWER OR HIGH-OLEIC SUNFLOWER), WHEY PROTEIN CONCENTRATE (REDUCED IN MINERALS), NONFAT DRY MILK*, AND LESS THAN 2% OF: SOY LECITHIN, POTASSIUM CITRATE, CALCIUM CITRATE, POTASSIUM CHLORIDE, 2'-O-FUCOSYLLACTOSE, *C. COHNII* OIL, *M. ALPINA* OIL, CALCIUM PHOSPHATE, CHOLINE BITARTRATE, SODIUM ASCORBATE, SODIUM CHLORIDE, TAURINE, MAGNESIUM CHLORIDE, *LACTOBACILLUS REUTERI* (DSM 17938) CULTURES, POTASSIUM HYDROXIDE, NUCLEOTIDES (CYTIDINE 5'-MONOPHOSPHATE, DISODIUM URIDINE 5'-MONOPHOSPHATE, ADENOSINE 5'-MONOPHOSPHATE, DISODIUM GUANOSINE 5'-MONOPHOSPHATE), INOSITOL, FERROUS SULFATE, ALPHA-TOCOPHERYL ACETATE, MIXED TOCOPHEROLS, ASCORBYL PALMITATE, L-HISTIDINE, ZINC SULFATE, NIACINAMIDE, CALCIUM PANTOTHENATE, L-CARNITINE, COPPER SULFATE, VITAMIN A ACETATE, RIBOFLAVIN, THIAMINE MONONITRATE, PYRIDOXINE HYDROCHLORIDE, MANGANESE SULFATE, CITRIC ACID, POTASSIUM IODIDE, FOLIC ACID, PHYLLOQUINONE, BIOTIN, SODIUM SELENATE, VITAMIN D3, VITAMIN B12.

*A2 BETA (β)-CASEIN MILK PROTEIN FROM A2 MILK     *C. COHNII* OIL: A SOURCE OF DHA
2'-O-FUCOSYLLACTOSE (2'-FL): A TYPE OF PREBIOTIC     *M. ALPINA* OIL: A SOURCE OF ARA

51.     Similarly, "Gerber Good Start Gentle Supreme A2 Toddler Drink" prominently represents that it is a "NON GMO" Product.  However, the Product contains several genetically modified ingredients, including nonfat dry milk (*i.e.*, A2 beta (β)-casein milk protein from cow's milk), lactose, and soy oil, as well as soy lecithin, *lactobacillus reuteri* (DSM 17938) cultures, mixed tocopherols, and alpha-tocopheryl acetate:



**INGREDIENTS:** NONFAT DRY MILK*, LACTOSE, VEGETABLE OILS (HIGH-OLEIC SAFFLOWER, SOY, PALM OLEIN, AND COCONUT), AND LESS THAN 2% OF: POTASSIUM PHOSPHATE, CALCIUM PHOSPHATE, SOY LECITHIN, CALCIUM CITRATE, POTASSIUM CITRATE, MAGNESIUM PHOSPHATE, CALCIUM CHLORIDE, 2'-O-FUCOSYLLACTOSE, CHOLINE BITARTRATE, *M. ALPINA* OIL, *C. COHNII* OIL, SODIUM ASCORBATE, FERROUS SULFATE, *LACTOBACILLUS REUTERI* (DSM 17938) CULTURES, MIXED TOCOPHEROLS, ASCORBYL PALMITATE, ALPHA-TOCOPHERYL ACETATE, ZINC SULFATE, NIACINAMIDE, CALCIUM PANTOTHENATE, RIBOFLAVIN, PYRIDOXINE HYDROCHLORIDE, VITAMIN A ACETATE, THIAMINE MONONITRATE, MANGANESE SULFATE, FOLIC ACID, BIOTIN, VITAMIN D3.
**CONTAINS: MILK AND SOY.**

*A2 BETA (β)-CASEIN MILK PROTEIN FROM A2 MILK
2'-O-FUCOSYLLACTOSE (2'-FL): A TYPE OF PREBIOTIC
*C. COHNII* OIL: A SOURCE OF DHA
*M. ALPINA* OIL: A SOURCE OF ARA

///

///

///

///

///

///

///

///

///

52.     Defendant's "Gerber Good Start Extensive HA Powder Infant Formula" prominently represents that it is a "NON GMO" Product.  However, the Product contains several genetically modified ingredients, including corn maltodextrin, whey protein concentrate (from cow's milk), and soy oil, as well as ascorbic acid, citric acid, inositol, alpha-tocopheryl acetate, mixed tocopherols, and *B. lactis* cultures:



**INGREDIENTS:** CORN MALTODEXTRIN, ENZYMATICALLY HYDROLYZED WHEY PROTEIN ISOLATE (FROM MILK), MEDIUM-CHAIN TRIGLYCERIDES, VEGETABLE OILS (SOY, HIGH OLEIC SUNFLOWER, AND HIGH 2-PALMITIC VEGETABLE OIL), POTATO STARCH, CALCIUM GLYCEROPHOSPHATE, AND LESS THAN 2% OF: CITRIC ACID ESTERS OF MONO- AND DIGLYCERIDES, CALCIUM HYDROXIDE, POTASSIUM HYDROXIDE, CORN SYRUP SOLIDS, CHOLINE BITARTRATE, POTASSIUM CHLORIDE, POTASSIUM PHOSPHATE, SODIUM CHLORIDE, SODIUM ASCORBATE, MAGNESIUM CHLORIDE, *M. ALPINA* OIL, *C. COHNII* OIL, INOSITOL, CALCIUM CHLORIDE, TAURINE, NUCLEOTIDES (CYTIDINE 5'-MONOPHOSPHATE, DISODIUM URIDINE 5'-MONOPHOSPHATE, ADENOSINE 5'-MONOPHOSPHATE, DISODIUM GUANOSINE 5'-MONOPHOSPHATE), FERROUS SULFATE, ALPHA-TOCOPHERYL ACETATE, ZINC SULFATE, L-CARNITINE, MIXED TOCOPHEROLS, NIACINAMIDE, CALCIUM PANTOTHENATE, ASCORBYL PALMITATE, COPPER SULFATE, RIBOFLAVIN, PYRIDOXINE HYDROCHLORIDE, VITAMIN A ACETATE, THIAMINE MONONITRATE, CITRIC ACID, MANGANESE SULFATE, POTASSIUM IODIDE, FOLIC ACID, PHYLLOQUINONE, SODIUM SELENATE, BIOTIN, VITAMIN D₃, VITAMIN B₁₂, *B. LACTIS* CULTURES.

**NON GMO** NOT MADE WITH GENETICALLY ENGINEERED INGREDIENTS

USE BY DATE ON CAN END • DO NOT USE IF OUTER OR INNER SEAL IS DAMAGED.
**NUTRIENTS** PER 100 CALORIES (5 FL OZ, PREPARED AS DIRECTED):

| | | | | | |
|---|---|---|---|---|---|
| PROTEIN | 2.6 | g | WATER | 133 | g |
| FAT | 5.1 | g | LINOLEIC ACID | 777 | mg |
| CARBOHYDRATE | 10.9 | g | | | |

**VITAMINS**

| | | | | | |
|---|---|---|---|---|---|
| A | 312 | IU | NIACIN | 1028 | mcg |
| D | 45 | IU | FOLIC ACID (FOLACIN) | 15 | mcg |
| E | 2 | IU | PANTOTHENIC ACID | 730 | mcg |
| K | 10 | mcg | BIOTIN | 2 | mcg |
| THIAMINE (B₁) | 93 | mcg | C (ASCORBIC ACID) | 14 | mg |
| RIBOFLAVIN (B₂) | 152 | mcg | CHOLINE | 24 | mg |
| B₆ | 79 | mcg | INOSITOL | 20 | mg |
| B₁₂ | 0.3 | mcg | | | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

53.    Defendant's "Gerber Good Start Grow Powder Toddler Drink" prominently represents that it is a "NON GMO" Product.  However, the Product contains several genetically modified ingredients, including nonfat dry milk, soy oil, soy lecithin, *B. lactis* cultures, and mixed tocopherols:



54.    Defendant's "Gerber Supported Sitter 1st Foods, DHA & Probiotic Baby Cereal" contains several genetically modified ingredients, including soy lecithin, *B. lactis* cultures, calcium carbonate, ascorbic acid, and alpha tocopheryl acetate:



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

55.      Defendant's "Gerber Sitter 2nd Foods, Probiotic Oatmeal Banana Baby Cereal" prominently represents that it is a "NON GMO" Product.  However, the Product contains several genetically modified ingredients, including *B. lactis* cultures, calcium carbonate, ascorbic acid, and alpha tocopheryl acetate:



56.      Likewise, "Gerber Sitter 2nd Foods, Probiotic Oatmeal Peach Apple Baby Cereal" prominently represents that it is a "NON GMO" Product.  However, the Product contains several genetically modified ingredients, including *B. lactis* cultures, calcium carbonate, ascorbic acid, and alpha tocopheryl acetate:



57.     Defendant's "Gerber Sitter 2nd Foods, Probiotic Rice Banana Apple Baby Cereal" prominently represents that it is a "NON GMO" Product. However, the Product contains several genetically modified ingredients, including soy lecithin, citric acid, *B. lactis* cultures, calcium carbonate, ascorbic acid, and alpha tocopheryl acetate:



58.     Defendant's "Gerber Sitter 2nd Foods, Powerblend Probiotic Baby Cereal - Oatmeal, Lentil, Carrots & Peas" prominently represents that it is a "NON GMO" Product. However, the Product contains several genetically modified ingredients, including cornstarch, maltodextrin, *B. lactis* cultures, calcium carbonate, ascorbic acid, and alpha tocopheryl acetate:



59.     Defendant's "Gerber Sitter 2nd Foods, Powerblend Probiotic Baby Cereal - Oatmeal, Lentil, Carrots & Apples" prominently represents that it is a "NON GMO" Product. However, the Product contains several genetically modified ingredients, including cornstarch, maltodextrin, *B. lactis* cultures, calcium carbonate, ascorbic acid, and alpha tocopheryl acetate:



60.     Defendant's "Gerber Oatmeal & Barley Apple Cinnamon Toddler Cereal" prominently represents that it is a "NON GMO" Product.  However, the Product contains several genetically modified ingredients, including sugar, modified corn starch, ascorbic acid, lactic acid, and alpha tocopheryl acetate:



1
2
3
4
5

61.    Defendant's "Gerber Oatmeal & Barley Bananas & Cream Toddler Cereal" prominently represents that it is a "NON GMO" Product.  However, the Product contains several genetically modified ingredients, including dry yogurt (containing cultured nonfat milk and nonfat milk from cows, which was heat treated after culturing), sugar, modified corn starch, lactic acid, and alpha tocopheryl acetate:



6
7
8
9
10
11
12
13
14

15
16
17
18
19

62.    Defendant's "Gerber Strong Puree Toddler Pouches – Banana, Blueberry, Purple Carrot, Greek Yogurt, & Mixed Grains" prominently represents that it is a "NON GMO" Product. However, the Product contains several genetically modified ingredients, including nonfat yogurt containing cultured nonfat milk and cultured reduced lactose, as well as ascorbic acid and alpha tocopheryl acetate:



20
21
22
23
24
25
26
27
28

63.     Defendant's "Gerber Strong Puree Toddler Pouches – Pear, Sweet Potato, Greek Yogurt, Oats, & Cinnamon" prominently represents that it is a "NON GMO" Product.  However, the Product contains several genetically modified ingredients, including nonfat yogurt made from cultured nonfat milk and nonfat dry milk, as well as ascorbic acid and alpha tocopheryl acetate:



64.     Defendant's "Gerber Fruit & Yogurt Puree Toddler Pouches – Peaches & Cream" prominently represents that it is a "NON GMO" Product.  However, the Product contains several genetically modified ingredients, including cultured lowfat milk, sugar, nonfat milk, ascorbic acid, and alpha tocopheryl acetate:



1

2

3

4

65.     Defendant's "Gerber Fruit & Yogurt Puree Toddler Pouches – Strawberry Banana" prominently represents that it is a "NON GMO" Product.  However, the Product contains several genetically modified ingredients, including cultured lowfat milk, sugar, nonfat milk, ascorbic acid, lactic acid, and alpha tocopheryl acetate:



5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

66.     Defendant's "Gerber Lil' Crunchies, Apple Sweet Potato Crawler Snack" prominently represents that it is a "NON GMO" Product.  However, the Product contains several genetically modified ingredients, including whole grain yellow corn meal, degermed yellow corn meal, brown sugar, sugar, maltodextrin, nonfat dry milk, mixed tocopherols, and alpha tocopheryl acetate:



67.     Defendant's "Gerber Lil' Crunchies, Mild Cheddar Crawler Snack" prominently represents that it is a "NON GMO" Product.  However, the Product contains several genetically modified ingredients, including degermed yellow corn meal, maltodextrin, cultured milk, butter fat, calcium carbonate, mixed tocopherols, and alpha tocopheryl acetate:



1
2
3
4
5

68.     Defendant's "Gerber Lil' Crunchies, Veggie Dip Crawler Snack" prominently represents that it is a "NON GMO" Product.  However, the Product contains several genetically modified ingredients, including degermed yellow corn meal, maltodextrin, sour cream solids (made of cultured cream and nonfat milk), calcium carbonate, mixed tocopherols, and alpha tocopheryl acetate:

6
7
8
9
10
11
12
13
14



15
16
17
18

69.     Defendant's "Gerber Lil' Crunchies, Garden Tomato Crawler Snack" prominently represents that it is a "NON GMO" Product.  However, the Product contains several genetically modified ingredients, including degermed yellow corn meal, maltodextrin, sugar, calcium carbonate, mixed tocopherols, and alpha tocopheryl acetate:

19
20
21
22
23
24
25
26
27
28



70.     Similarly, Defendant's "Gerber Lil' Crunchies, Ranch Crawler Snack" prominently represents that it is a "NON GMO" Product. However, the Product contains several genetically modified ingredients, including degermed yellow corn meal, maltodextrin, sour cream powder (made of cultured cream and nonfat milk), nonfat dry milk, sugar, cultured milk, calcium cardonate, mixed tocopherols, and alpha tocopheryl acetate.

71.     Likewise, Defendant's "Gerber Lil' Crunchies, Vanilla Maple Crawler Snack" prominently represents that it is a "NON GMO" Product. However, the Product contains several genetically modified ingredients, including degermed yellow corn meal, maltodextrin, sour cream powder (made of cultured cream and nonfat milk), nonfat dry milk, sugar, cultured milk, calcium carbonate, mixed tocopherols, and alpha tocopheryl acetate.

72.     Defendant's "Gerber Teether Wheels, Apple Harvest Crawler Snack" prominently represents that it is a "NON GMO" Product. However, the Product contains several genetically modified ingredients, including whole grain yellow corn meal, mixed tocopherols, and alpha tocopheryl acetate:



1
2
3

73.    Defendant's "Gerber Garden Tomato Mealtime Harvest Bowl" prominently represents that it is a "NON GMO" Product.  However, the Product contains several genetically modified ingredients, including canola oil, milk cultures, and whey from cow's milk:



74.    Defendant's "Gerber Spanish Style Sofrito Mealtime Harvest Bowl" prominently represents that it is a "NON GMO" Product.  However, the Product contains several genetically modified ingredients, including corn and canola oil:

 

75.    Defendant's "Gerber Pesto Mealtime Harvest Bowl" prominently represents that it is a "NON GMO" Product.   However, the Product contains several genetically modified ingredients, including canola oil, parmesan cheese made from cow's milk, and whey from cow's milk:



**INGREDIENTS:** COOKED ENRICHED MACARONI PRODUCT (WATER, WHEAT SEMOLINA, EGG WHITES, NIACIN, FERROUS SULFATE, THIAMINE MONONITRATE, RIBOFLAVIN, FOLIC ACID), DICED TOMATOES, YELLOW BELL PEPPERS, ROASTED ZUCCHINI, WATER, CANOLA OIL, TAPIOCA FLOUR, BASIL, GARLIC, OLIVE OIL, ONIONS, SALT, PARMESAN CHEESE (MILK, CULTURES, SALT, ENZYMES), WHEY (FROM MILK), BASIL OIL, BLACK PEPPER. **CONTAINS: WHEAT, EGG, AND MILK.**

76.    The presence of genetically modified ingredients in the Products renders Defendant's description of "NON GMO" false and misleading under an objective reasonable consumer standard.

## RULE 9(B) ALLEGATIONS

77.    Federal Rules of Civil Procedure, Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).   To the extent necessary, as detailed in the paragraphs above and below, Plaintiff has satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity:

78.     WHO: Defendant made material misrepresentations and omissions of fact in the labeling, packaging, and marketing of the Products.

79.     WHAT: Defendant made material misrepresentations and omissions of fact by using the terms "Non-GMO" in the labeling, packaging, and marketing of the Products.  Defendant made these claims with respect to the Products even though the Products did not meet the requirements to make such claims.   Defendant's misrepresentations and omissions were material because a reasonable consumer would not have purchased or paid as much for the Products if he or she knew that they contained false representations.

80.     WHEN:  Defendant made the material misrepresentations and omissions detailed herein continuously throughout the Class Period.

81.     WHERE:  Defendant's material misrepresentations and omissions were made, inter alia,   on   the   labeling   and   packaging   of   the   Products,   on   Defendant's   website   at https://www.gerber.com/, on the websites of authorized third-party retailers of the Products, on in-store signage at brick-and-mortar locations of authorized third-party retailers of the Products, and through Defendant's various other advertisements.

82.     HOW:  Defendant made written misrepresentations and failed to disclose material facts on the labeling and packaging of the Products and on its website and other advertising.

83.     WHY:   Defendant engaged in the material misrepresentations and omissions detailed herein for the express purpose of inducing Plaintiff and other reasonable consumers to purchase and/or pay a premium for Products based on the belief that they were "Non-GMO." Defendant profited by selling the Products to millions of unsuspecting consumes nationwide.

## CLASS ALLEGATIONS

84.     ***Class Definition.***   Plaintiff brings this action on behalf of a class of similarly situated individuals, defined as all persons in the United States who, who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, purchased any of the Products at issue (the "Class").

(a)     ***California Subclass.***   Plaintiff Faith Norman also seeks to represent a subclass of all Class members who, within the applicable statute of limitations period, up to an

including the date of final judgment in this action, purchased any of the Products at issue in California (the "California Subclass").

85.     Excluded from the Class and California Subclass are persons who made such purchase for purpose of resale, Defendant and any entities in which Defendant has a controlling interest, Defendant's agents and employees, the judge to whom this action is assigned, and members of the judge's staff, and the judge's immediate family.

86.     Plaintiff reserves the right to amend the definition of the Class and Subclass if discovery or further investigation reveals that the Class or Subclass should be expanded or otherwise modified.

87.     ***Numerosity.***   Members of the Class and Subclass are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class and Subclass number in the millions.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

88.     ***Commonality and Predominance.***  Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include but are not limited to: whether Defendant warranted the Products as "Non-GMO"; whether the Products contain genetically modified organisms; whether Defendant breached these warranties; and whether Defendant committed the statutory and common law violations alleged against them herein by doing so.

89.     ***Typicality.***  The claims of the named Plaintiff are typical of the claims of the Class in that Plaintiff purchased one of Defendant's Products in reliance on the representations and warranties described above and suffered a loss as a result of that purchase.

90.     ***Adequacy.***  Plaintiff is an adequate representative of the Class and California Subclass because her interests do not conflict with the interests of the Class and Subclass members she seeks to represent, they have retained competent counsel experienced in prosecuting class

1  actions, and they intend to prosecute this action vigorously.  The interests of the Class and Subclass

2  members will be fairly and adequately protected by Plaintiff and her counsel.

3      91.  ***Superiority.***  The class mechanism is superior to other available means for the fair

4  and efficient adjudication of the claims of Class members.  Each individual Class member may

5  lack the resources to undergo the burden and expense of individual prosecution of the complex and

6  extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases

7  the delay and expense to all parties and multiplies the burden on the judicial system presented by

8  the complex legal and factual issues of this case.  Individualized litigation also presents a potential

9  for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer

10  management difficulties and provides the benefits of single adjudication, economy of scale, and

11  comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment

12  of the liability issues will ensure that all claims and claimants are before this Court for consistent

13  adjudication of liability issues.

14      92.  Defendant has acted or failed to act on grounds generally applicable to the Class,

15  thereby making appropriate final injunctive relief with respect to the Class and Subclass as a

16  whole.

17      93.  Without a class action, Defendant will continue a course of action that will result in

18  further damages to Plaintiff and members of the Class and California Subclass and will likely

19  retain the benefits of its wrongdoing.

20      94.  Based on the foregoing allegations, Plaintiff's claims for relief include those set

21  forth below.

**CLAIMS FOR RELIEF**

**COUNT I**
**Violations of California's Unfair Competition Law ("UCL"),**
**California Business & Professions Code §§ 17200, *et seq.***
**(On Behalf Of The California Subclass)**

25      95.  Plaintiff hereby incorporates by reference the allegations contained in all preceding

26  paragraphs of this complaint.

96.     Plaintiff Norman brings this claim individually and on behalf of the members of the proposed California Subclass against Defendant.

97.     Defendant is subject to California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*.  The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising[.]"

98.     Defendant's misrepresentations and other conduct, described herein, violated the "unlawful" prong of the UCL by violating the CLRA as described herein, the FAL as described herein, and Cal. Com. Code § 2607.

99.     Defendant's misrepresentations and other conduct, described herein, violated the "unfair" prong of the UCL in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the gravity of the conduct outweighs any alleged benefits.

100.    Defendant violated the "fraudulent" prong of the UCL by making misrepresentations about the Products at issue that were untrue and misleading, as described herein.

101.    Plaintiff Norman and the California Subclass lost money or property as a result of Defendant's UCL violations because: (a) they would not have purchased the Products on the same terms if the true facts were known about the product; (b) they paid a price premium for the Products due to Defendant's promises and warranties; and (c) the Products do not have the characteristics as promised by Defendant.

## COUNT II
### Violation Of California's False Advertising Law ("FAL"), California Business & Professions Code §§ 17500, *et seq*. (On Behalf Of The California Subclass)

102.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this Complaint.

103.    Plaintiff Norman brings this claim individually and on behalf of the members of the proposed California Subclass against Defendant.

104.    California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, … in any advertising device … or in any other manner or means whatever, including over the Internet, any statement, concerning … personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

105.    Defendant committed acts of false advertising, as defined by § 17500, by misrepresenting that the Products are "Non-GMO" products, when in fact they are not.

106.    Defendant knew or should have known, through the exercise of reasonable care, that its Non-GMO Claims about the Products were untrue and misleading.

107.    Defendant's actions in violation of § 17500 were false and misleading such that the general public is and was likely to be deceived.

108.    Plaintiff Norman and the California Subclass lost money or property as a result of Defendant's FAL violations because: (a) they would not have purchased the Products on the same terms if the true facts were known about the product; (b) they paid a price premium for the Products due to Defendant's promises and warranties; and (c) the Products do not have the characteristics as promised by Defendant.

## COUNT III
**Violation Of California's Consumers Legal Remedies Act ("CLRA"),**
**California Civil Code §§ 1750, *et seq*.**
**(On Behalf Of The California Subclass)**

109.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this Complaint.

110.    Plaintiff Norman brings this claim individually and on behalf of the members of the proposed California Subclass against Defendant.

111.    Plaintiff Norman and members of the Class are "consumers" within the meaning of Cal. Civil Code § 1761(d) in that Plaintiff and the Class sought or acquired Defendant's goods and/or services for personal, family, or household purposes.

112.   Defendant's Products are "goods" within the meaning of Cal. Civil Code § 1761(a). The purchases by Plaintiff and the Class are "transactions" within the meaning of Cal. Civil Code § 1761(e).

113.   The acts and practices of Defendant as described above were intended to deceive Plaintiff and the Class as described herein, and have resulted, and will continue to result, in damages to Plaintiff and members of the Class.  These actions violated, and continue to violate, the CLRA in at least the following respects: (a) Defendant's acts and practices constitute representations deceiving that the Products have characteristics, uses, and/or benefits, which they do not have, in violation of Cal. Civil Code § 1770(a)(5); (b) Defendant's acts and practices constitute representations that the Products are of a particular standard, quality, or grade, when in fact they are of another, in violation of Cal. Civil Code § 1770(a)(7); and (c) Defendant's acts and practices constitute the advertisement of the Products in question with the intent not to sell them as advertised, in violation of Cal. Civil Code § 1770(a)(9).

114.   Defendant violated these provisions of the CLRA by misrepresenting that the Products are "Non-GMO" products, when in fact they are not.

115.   Defendant knew or should have known, through the exercise of reasonable care, that its Non-GMO Claims about the Products were untrue and misleading.

116.   Plaintiff Norman and the California Subclass suffered injuries caused by Defendant's CLRA violations because: (a) they would not have purchased the Products on the same terms if the true facts were known about the product; (b) they paid a price premium for the Products due to Defendant's false and misleading promises and warranties; and (c) the Products do not have the characteristics as promised by Defendant.

117.   Plaintiff Norman, on behalf of herself and all other members the California Subclass, seeks an injunction prohibiting Defendant from continuing its unlawful practices in violation of the CLRA.

118.   In compliance with the provisions of California Civil Code § 1782, Plaintiff sent written notice to Defendant prior to filing this action on October 25, 2021, informing Defendant of their intention to seek damages under California Civil Code § 1750.  The letter was sent via

certified mail, return request, advising Defendant that it was in violation of the CLRA and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter expressly stated that it was sent on behalf of Plaintiff and "all other persons similarly situated."  Accordingly, Plaintiff Norman, individually and on behalf of the proposed California Subclass, seeks monetary damages from Defendant as permitted by Civil Code § 1782(d) for Defendant's violations of the CLRA.

**COUNT IV**
**Breach Of Express Warranty**
**(On Behalf Of The Nationwide Class And California Subclass)**

119.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

120.     Plaintiff Norman brings this claim individually and on behalf of the members of the proposed Class and California Subclass against Defendant.

121.     Defendant, as the designer, manufacturer, marketer, distributor, and/or seller of the Products at issue, expressly warranted that the Products as "Non-GMO," among other Misrepresentations.

122.     In fact, the Products are not "Non-GMO" as Defendant claims, because they contain several ingredients derived from GMOs, and thus are not as marketed, advertised, and/or warranted.

123.     As a result of Defendant's false and/or misleading misrepresentations, including that the Products are "Non-GMO," the Products were defective and did not adhere to the express warranty when first sold to Plaintiff and Class Members, and have not been repaired, replaced, or otherwise remedied as originally warranted since the time of sale.

124.     By breaching its express warranty, Defendant has caused and continues to cause these warranties to fail of their essential purpose.

125.     Plaintiff and Class Members have been injured and harmed as a direct and proximate cause of Defendant's breach of express warranty because: (a) they would not have purchased the Products on the same terms if the true facts had been known at the point of purchase;

(b) they paid a price premium for the Products due to Defendant's false and misleading promises and warranties; and (c) the purportedly "Non-GMO" Products do not have the characteristics, uses, or benefits as promised by Defendant because they contain several ingredients derived from GMOs.

126.    Plaintiff, individually and on behalf of the Class and California Subclass, seek all damages permitted by law, including compensation for the monetary difference between the Products as warranted and as sold, along with all other incidental and consequential damages, statutory damages, attorney's fees, and all other relief allowed by law.

### COUNT V
**Breach Of The Implied Warranty Of Merchantability**
**(On Behalf Of The Nationwide Class And California Subclass)**

127.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

128.    Plaintiff Norman brings this claim individually and on behalf of the members of the proposed Class and Subclass against Defendant.

129.    Defendant, as the designer, manufacturer, marketer, distributor, and/or seller of the Products, impliedly warranted that the Products are "Non-GMO" when in fact they are not, among other Misrepresentations.

130.    Defendant breached the warranty implied in the contract for the sale of the Products because they could not pass without objection in the trade under the contract description, the goods were not of fair average quality within the description, the goods were not fit for the ordinary purposes for which such goods are used, and the goods do not conform to the promises or affirmations of fact made on the label.  As a result, Plaintiff and Class Members did not receive the goods as impliedly warranted by Defendant to be merchantable.

131.    Plaintiff and Class Members purchased the Products in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the purpose.

132.    The Products were not altered by Plaintiff or Class Members.

133.    The Products were defective when they left the exclusive control of Defendant.

134.   Defendant knew that the Products would be purchased and used without additional testing by Plaintiff and Class Members.

135.   As a result of Defendant's false and/or misleading representation that the Products are "Non-GMO" (among other Misrepresentations), the Products were defectively designed and unfit for their intended purpose, and Plaintiff and Class Members did not receive the goods as warranted.

136.   Plaintiff and Class Members have been injured and harmed as a direct and proximate cause of Defendant's breach of implied warranty because: (a) they would not have purchased the Products on the same terms if the true facts were known about the Products at the point of purchase; (b) they paid a price premium for the Products due to Defendant's false and misleading promises and warranties; and (c) the Products do not have the characteristics as promised by Defendant.

**COUNT VI**
**Unjust Enrichment / Restitution**
**(On Behalf Of The Nationwide Class And California Subclass)**

137.   Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

138.   Plaintiff Norman brings this claim individually and on behalf of the members of the proposed Class and California Subclass against Defendant.

139.   To the extent the Court determines it is necessary to do so, this claim is pled in the alternative to the other legal claims alleged in the complaint.

140.   Plaintiff and Class Members conferred benefits on Defendant by purchasing the purportedly "Non-GMO" Products.  Defendant was and should have been reasonably expected to provide Products that conform with the qualities listed on their labeling and packaging.

141.   Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and Class Members' purchases of the Products.  Retention of those moneys under these circumstances is unjust and inequitable because Defendant misrepresented that the Products are "Non-GMO" products (among other Misrepresentations) at the time of sale.  These Non-GMO

Misrepresentations caused injuries to Plaintiff and Class Members because they would not have purchased the Products if the true facts were known.

142.    Defendant unjustly profited from the sale of the Products at inflated prices as a result of its false representations, omissions, and concealment of the true qualities of the Products. Defendant benefited at Plaintiff's and Class Members' expenses when it sold GMO-riddled Products that were inferior to the purportedly "Non-GMO" Products that Plaintiff and Class Members thought they were actually purchasing, yet the price they paid was the price for a "Non-GMO" Products that are 100% free of ingredients derived from GM crops or food sources, genetically engineered in a laboratory setting through the use of biotechnologies, or sourced from animals that have been raised on GMO feed.

143.    As a proximate result of Defendant's false representations, omissions, and/or concealment of the true qualities of the Products, and as a result of Defendant's resulting ill-gotten gains, benefits, and profits, Defendant has been unjustly enriched at the expense of Plaintiff and Class Members.  It would be inequitable for Defendant to retain its ill-gotten profits without paying the value thereof to Plaintiff and Class Members.

144.    There is a direct relationship between Defendant on the one hand, and Plaintiff and Class Members on the other, sufficient to support a claim for unjust enrichment.  Defendant marketed and sold the Products with the false and misleading Misrepresentations that they were "Non-GMO" on their labeling and packaging to improve retail sales, which in turn improved wholesale sales.  Conversely, Defendant knew that disclosure of the true and GMO-riddled nature of the Products would suppress retail and wholesale sales of the Products, in turn suppressing the demand for the Products, and would negatively impact the reputation of Defendant's brand among Class Members and consumers.

145.    Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and Class Members is unjust and inequitable, Plaintiff and Class Members are entitled to restitution for their unjust enrichment in the amount of Defendant's ill-gotten gains, benefits, and profits, including interest thereon.  Accordingly, Plaintiff seeks, individually and on behalf of Class

and Subclass Members, an order requiring Defendant to disgorge its gains and profits to Plaintiff and members of the Classes, together with interest, in a manner to be determined by the Court.

## COUNT VII
### Negligent Misrepresentation
### (On Behalf Of The Nationwide Class And California Subclass)

146.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

147.    Plaintiff Norman brings this claim individually and on behalf of the members of the proposed Class and California Subclass against Defendant.

148.    As discussed above, Defendant misrepresented that the Products are "Non-GMO" (among other misrepresentations), notwithstanding the fact that the Products do contain several ingredients derived from GMOs and are therefore not, in fact, "Non-GMO" as their labeling and packaging prominently states.

149.    At the time Defendant made these representations, Defendant knew or should have known that these representations were false or made them without knowledge of their truth or veracity.  At an absolute minimum, Defendant negligently misrepresented as "Non-GMO" and/or negligently omitted material facts about the Products at issue, namely that the Products do, in fact, contain GMOs.

150.    Defendant had no reasonable grounds for believing that its representations were true because Defendant failed to consistently ensure that it was able to produce the Products as free of GMOs, as advertised.

151.    The negligent misrepresentations and omissions made by Defendant, upon which Plaintiff and Class members reasonably and justifiably relied, were intended to induce, and actually did induce, Plaintiff and Class Members to purchase the Products.  In making these negligent misrepresentations and omissions to Plaintiff and the Class, upon which Plaintiff and Class Members reasonably and justifiably relied, Defendant intended to induce, and actually did induce, Plaintiff and Class Members to purchase its "GMO-Free" Products.

152.    At all times herein, Plaintiff and Class Members were unaware of the falsity of Defendant's statements.

153.    Plaintiff and Class Members reasonably acted in response to the statements made by Defendant when they purchased the Products.

154.    As a direct and proximate result of Defendant's negligent misrepresentations and omissions regarding the true nature of the Products, Plaintiff and Class Members were injured. Specifically, Plaintiff and Class Members incurred economic harm as a result of Defendant's negligent misrepresentations and/or omissions in that they would not have purchased the Products or would not have purchased them on the same terms, but for Defendant's unlawful conduct alleged herein.   Accordingly, Plaintiff and Class Members are entitled to compensatory and/or punitive damages in an amount to be proven at trial.

## COUNT VIII
### Fraud
### (On Behalf Of The Nationwide Class And California Subclass)

155.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

156.    Plaintiff Norman bring this claim individually and on behalf of the members of the proposed Class and Subclass against Defendant.

157.    As discussed above, Defendant provided Plaintiff and Class Members with false or misleading material information and failed to disclose material facts about the Products, including but not limited to the fact that each of the purportedly "Non-GMO" Products do indeed contain several ingredients derived from GMOs and are therefore not, in fact, "Non-GMO" as their labeling and packaging prominently states.   These misrepresentations and omissions were made with knowledge of their falsehood.

158.    These misrepresentations and omissions made by Defendant, upon which Plaintiff and Class Members reasonably and justifiably relied, were intended to induce, and actually induced, Plaintiff and Class members to purchase the Products.

159.    The fraudulent actions of Defendant caused damage to Plaintiff and Class and Subclass Members, who are entitled to damages and other legal and equitable relief as a result.

160.    Further, as a result of Defendant's willful and malicious conduct, punitive damages are warranted.

**COUNT IX**
**Fraudulent Misrepresentation**
**(On Behalf Of The Nationwide Class And California Subclass)**

161.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

162.    Plaintiff Norman brings this claim individually and on behalf of the members of the proposed Class and California Subclass against Defendant.

163.    At all relevant times, Defendant was engaged in the business of manufacturing, marketing, packaging, distributing, and selling the Products.

164.    Defendant, acting through its representatives or agents, delivered the Products to its own distributors and various other distribution channels.

165.    Defendant willfully, falsely, and knowingly omitted various material facts regarding the true nature, quality, and characteristics of the Products, namely pertaining to the "Non-GMO" representation.

166.    Rather than inform consumers of the truth regarding the GMOs in the Products, Defendant misrepresented the Products as "Non-GMO" at the time of purchase.

167.    Defendant made these material misrepresentations to boost or to maintain sales of the Products, and to falsely assure purchasers that it is a company that cares about GMOs in foods, as discussed throughout.  The false representations were material to consumers, including Plaintiff, because the representations played a significant role in the decision to purchase the Products.

168.    Plaintiff and Class members accepted the terms in purchasing the Products, which were silent on the true quality, nature, and characteristics of the Products.  Plaintiff and Class members had no reasonable way of knowing of Defendant's misrepresentation as to the Products, and had no way of knowing that the misrepresentations were misleading.

169.    Although Defendant had a duty, arising, in part, from its superior knowledge, to ensure that accuracy of the information regarding whether its ingredients were in fact genetically modified, it did not fulfill these duties.

170.    Instead, Defendant misrepresented material facts partly to pad and protect its profits, as it saw that profits and sales were essential for its continued growth and to maintain and grow its reputation as a producer of Non-GMO foods.  Such benefits came at the expense of Plaintiff and Class members.

171.    Plaintiff and Class members were unaware of these material misrepresentations, and they would not have acted as they did had they known the truth.  Plaintiff's and Class members' actions were justified given Defendant's misrepresentations.  Defendant was in the exclusive control of material facts, and such facts were not known to the public.

172.    Due to Defendant's misrepresentations, Plaintiff and Class members sustained injury due to the purchase of Products that did not live up to their advertised and packaged representations, especially those concerning the GMO-free representations.  Plaintiff and Class members are entitled to recover full or partial refunds for Products they purchased due to Defendant's misrepresentations, or they are entitled to damages for the diminished value of their Products, amounts to be determined at trial.

173.    Defendant's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiff and Class member's rights and well-being, and in part to enrich itself at the expense of consumers.  Defendant's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competitor's products, and to boost its reputation as a maker of Non-GMO foods.  Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

(a)     For an order certifying the nationwide Class and the California Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff

1

as representative of the Class and of the California Subclass, and Plaintiff's attorneys as Class Counsel to represent the proposed Class and Subclass;

2

3     (b)     For an order declaring that Defendant's conduct violates the statutes referenced herein;

4

5     (c)     For an order finding in favor of Plaintiff, the Class, and the Subclass on all counts asserted herein;

6     (d)     For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

7

8     (e)     For prejudgment interest on all amounts awarded;

9     (f)     For an order of restitution and all other forms of equitable monetary relief;

10    (g)     For injunctive relief as pleaded or as the Court may deem proper;

11    (h)     For an order awarding Plaintiff and members of the Class and California Subclass their reasonable attorneys' fees and reimbursement of litigation expenses and costs of suit; and

12

13

14    (i)     For such other and further relief as the Court may deem proper.

15                                    **JURY DEMAND**

16          Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any

17    and all issues in this action so triable as of right.

18    Dated: December 22, 2021                    Respectfully submitted,

19                                                **BURSOR & FISHER, P.A.**

20                                                By:   _/s/ L. Timothy Fisher_

21
                                                  L. Timothy Fisher (State Bar No. 191626)
22                                                Sean L. Litteral (State Bar No. 331985)
                                                  Julia K. Venditti (State Bar No. 332688)
23                                                1990 North California Boulevard, Suite 940
                                                  Walnut Creek, CA  94596
24                                                Telephone: (925) 300-4455
                                                  Facsimile:  (925) 407-2700
25                                                Email: ltfisher@bursor.com
                                                         slitteral@bursor.com
26                                                       jvenditti@bursor.com

27
                                                  *Attorneys for Plaintiff and the Putative Class*
28

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, L. Timothy Fisher, declare as follows:

1.      I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiff Faith Norman.  Plaintiff Norman resides in San Jose, California.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.      The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Northern District of California, as Plaintiff purchased the Products from brick-and-mortar retail stores located within this District.   Additionally, Defendant advertised, marketed, manufactured, distributed, and/or sold the Products at issue to Plaintiff in this District.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed at Walnut Creek, California this 22nd day of December, 2021.

_/s/ L. Timothy Fisher_____
L. Timothy Fisher